# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 07-248-02,04-05 (RCL)** |
| | ) | |
| **NANCY CONDE RUBIO,** | ) | |
| **also known as Doris Adriana,** | ) | |
| **also known as Alexandra Rubio Silva,** | ) | |
| **also known as Maritza,** | ) | |
| **also known as La Senora,** | ) | |
| **also known as La Tia,** | ) | |
| **also known as La Mona,** | ) | |
| **also known as Luz Dary,** | ) | |
| | ) | |
| **ANA ISABEL PENA AREVALO,** | ) | |
| **also known as Dona Chava,** | ) | |
| **also known as Dona Isa,** | ) | |
| **also known as Isabela,** | ) | |
| **also known as Elisa,** | ) | |
| | ) | |
| **LUZ MERY GUTIERREZ VERGARA,** | ) | |
| **also known as Mery,** | ) | |
| **also known as Luz Mery,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## GOVERNMENT'S MOTION IN LIMINE TO
## USE CERTAIN EVIDENCE IN ITS CASE-IN-CHIEF

**FACTUAL BACKGROUND**

***Introduction***

All three defendants before this Court, Nancy Conde Rubio, Ana Isabel Pena Arevalo,

and Luz Mery Gutierrez Vergara, are charged with conspiracy to provide material support or

resources to a foreign terrorist organization and with providing such support, all in violation of

18 U.S.C. §2339B(a)(1).  The Indictment also charges hostage taking in violation of 18 U.S.C.

§1203, for which none of these three defendants was charged.  Two other defendants in the

Indictment, Gerardo Antonio Aguilar Ramirez and Alexander Farfan Suarez, were charged with

overseeing that hostage taking, just as they were charged with overseeing the material support

conspiracy, but they were not extradited from Colombia to the United States in connection with

this case.  However, as alleged in the Indictment, the material support network was essential to

maintain custody and control of the hostages and to move them from place to place, thereby

avoiding their discovery, detection, and ultimately their liberation, by Colombian law

enforcement and military officials.  The evidence will show that maintaining control of the

hostages was an object of the FARC's terrorist goals; they were held and maintained by violence

to influence U.S. Government policy toward the FARC, and that therefore the evidence of their

detention is evidence of the material support conspiracy.  The Government maintains that the

hostages also were treated as any other commodity utilized by the material support network.

As alleged in the Indictment, the very same communications networks and supply routes

utilized to provide material support to the FARC was utilized to move and maintain control over

the three American hostages.  As alleged in the Indictment as the very *Object of the [Material

Support] Conspiracy*: "It was the purpose and object of the conspiracy for the defendants and

their co-conspirators to assist the FARC by establishing and personally serving in a logistical

support and supply network designed to procure weapons, ammunition, high technology devices,

money, and other materials and supplies, and to transport and deliver these and other

commodities, including hostages, to and among the FARC."  Indictment, Count One, #13

(emphasis added).

As alleged in the Indictment, the FARC held three American citizens, Marc D. Gonsalves, Thomas R. Howes, and Keith D. Stansell, hostage in the jungles of Colombia from on or about February 13, 2003 through July 2, 2008.[1]  Indictment, Count Three, #4.  The hostage taking is relevant to the material support conspiracy in two important respects: One, from on or about sometime in 2006 through at least April 27, 2007, the three American hostages were being held by the FARC's 1st Front; and two, the same logistical supply and communications network employed by the 1st Front to move equipment, supplies, money, and drugs, was also used to maintain control of and move the hostages.

Below, we describe the material support conspiracy charged in the Indictment, and then briefly outline the three hallmarks of that conspiracy as it relates to the FARC 1st Front's hostage taking: 1) satellite telephones and high-frequency, two-way radios; 2) transportation routes; and 3) radio call and drop-off centers.  Next, we discuss the evidence related to the hostage taking and rescue as it pertains directly to the charged material support conspiracy.  Then we note other ways in which other technology devices obtained through the material support network aided the hostage taking.  Finally, we identify the pertinent case law in support of our proposition.

### Conspiracy to Provide Material Support

As alleged in the Indictment, defendant Nancy Conde Rubio, also known as Doris Adriana ("CONDE RUBIO"), was a member of a designated foreign terrorist organization operating in the Republic of Colombia: the Fuerzas Armadas Revolucionarias de Colombia

---

[1] At the time the Indictment was returned on September 25, 2007, the three American hostages were still being held by the FARC.  On July 2, 2008, in a well publicized event that the Government will introduce evidence of at trial, the hostages were rescued from the FARC's 1st Front by a Colombian government military and law enforcement operation.

(known as the Revolutionary Armed Forces of Colombia, or the "FARC").  The FARC has sought to destabilize the Colombian government through violence against Colombian nationals, and it has also been strongly anti-American, characterizing American citizens as military targets in its campaign.  The FARC has engaged in violent acts against Americans in Colombia, including murders and a series of hostage takings committed as early as 1999 and continuing through the present.  The hostages were held not only in an attempt to extract policy concessions from the United States, but also to be used as human shields against Colombian military attacks on FARC strongholds.

The Government will present evidence at trial that the defendants conspired to command a logistical support and supply network to procure weapons, ammunition, high technology devices (especially satellite telephones), money, and other materials and supplies, and to transport and deliver these and other commodities, including hostages, to the FARC's 1st Front and other fronts, located in the departments (or states) of Guaviare and Vaupes, Colombia.  The satellite telephones used in the network were obtained from the United States, activated on a operating system based in the United States, and billed to accounts established and located in the United States.  The FARC's 1st Front communications network as a whole, as part of the logistical support network, was used as a tool to maintain control over the American hostages and to avoid detection by Colombian military and law enforcement officials.

CONDE RUBIO was a member of the FARC's 1st Front.[2]  CONDE RUBIO established and operated the FARC 1st Front's logistical support and supply network.  To supply itself, the

---

[2] A Front is a quasi-military organizational unit and subdivision of the seven guerilla blocs that the FARC is comprised of.  A Front is compromised of hundreds of guerrillas, and there are approximately ten fronts per bloc.

jungle-based FARC relied on a network with access to metropolitan and commercial centers in order to obtain materials and supplies, including co-defendants Ana Isabel Pena Arevalo ("PENA AREVALO") and Luz Mery Gutierrez Vergara ("GUTIERREZ VERGARA").  It was CONDE RUBIO's responsibility to make that supply network function.  In addition to recruiting individuals who could obtain the necessary supplies, the network could not function without firmly established air, river, and trail supply routes.  This same network, and the supply routes it utilized, was used to transport cocaine out of the jungle areas controlled by the FARC and to transport and receive weapons and money obtained from the sale of cocaine and through other means.  The communications network established and operated by CONDE RUBIO was critical to making this supply chain work.

The evidence will establish that the volume of cocaine, weapons, and materials required extensive, reliable, and secure lines of communication are indispensable to a well functioning logistical support network is an unassailable proposition.  One needs to communicate in order to make known what is needed, in what quantity, when, at what cost, where it is to be delivered, via what routes, and by whom.  CONDE RUBIO was responsible and commanded each of these components of the network.  She used the network, for example, to identify and contact those needed to supply resources to the FARC and to arrange payment for those items.  Through a complex series of river routes, jungle land routes, and clandestine airstrips, materials and supplies were moved to and from the FARC's 1st Front.

### Use of Satellite Telephones and HF Radios in the Conspiracy

The FARC 1st Front used satellite telephones in support of its logistical support network because neither conventional land line nor cellular telephone infrastructures existed in the jungle

5

areas controlled by the FARC.  The only other means by which  FARC members were able to communicate was through the use of two-way battery powered radios (or walkie-talkies) linked to call centers located in Villavicencio, the closest urban center to the jungle areas controlled by the FARC.  In Villavicencio, call center operators, including co-defendants PENA AREVALO and GUTIERREZ VERGARA, would patch the radio calls into the national and international telephone networks.

### Use of Transportation Routes in the Conspiracy

To bring supplies, including weapons, to the FARC, and to transport cocaine from the jungle areas controlled by the FARC out, the supply routes had to be established.  As alleged in the Indictment, these routes included surreptitiously moving supplies through the urban areas; transporting supplies in small cargo planes that landed at clandestine airstrips located in the Colombian jungle; and navigating trucks and river boats carrying supplies through remote jungle areas.

Conde Rubio and her co-conspirators found buyers for FARC-controlled cocaine, and supplied it to them via hidden transport routes that were established by her and her co-conspirators.  These clandestine airstrips, waterways, and truck routes extended beyond the borders of Colombia.   In exchange, the buyers would bring weapons and ammunition obtained from locations outside of Colombia, as well as money and other supplies, to the FARC.  Other co-conspirators who were members of the network used the profits from the sales of the cocaine to provide satellite phones and other high technology communications devices, among other materials and supplies, to the FARC via these hidden transport routes.

### *Use of Radio Call and Drop-Off Centers in the Conspiracy*

The communications equipment discussed above was used in concert with radio call centers. The radio call centers were small communications work stations located in Villavicencio – the nearest urban outpost to the jungle areas controlled by the FARC and known as the "Gateway to the Jungle." Indictment, Count One, #8. This communications network was used by FARC co-conspirators to communicate with each other, to facilitate the further procurement and shipment of supplies, and to maintain control of FARC hostages. Radio call centers, such as the ones owned and operated by co-defendants PENA AREVALO and GUTIERREZ VERGARA, not only functioned as communications centers for the logistical supply network, they also were used to deliver and receive oral and written messages, and as a drop-off and pickup sites for funds used to finance FARC activities.

### *The American Hostages and the Hostage Taking*

As alleged in the conspiracy to provide material support count of the Indictment, the FARC's 1st Front, the Front for which CONDE RUBIO had responsibility for establishing and operating the material and logistical supply network, maintained control of the hostages during parts of 2006 and 2007.[3] The same components of the network used to supply material support to the FARC was used to maintain custody and control of the hostages.

Gerardo Antonio Aguilar Ramirez, also known as Cesar ("CESAR"), and Alexander Farfan Suarez, also known as Enrique Gafas ("GAFAS") are charged in Count Three of the

---

[3] The Government's evidence at trial will show that the FARC's 1st Front actually maintained custody and control over the American hostages from late 2006 through July 2008.

Indictment with the hostage taking of the three American hostages discussed above.[4]  CESAR, as the FARC 1st Front Commander, was ultimately responsible for all of the FARC's 1st Front's activities, including the material support network for which he is also charged in the Indictment. As a commander in the 1st Front, but under the ultimate command of CESAR, GAFAS was tasked with maintaining and transporting the hostages.  In that capacity, he used and benefitted from the logistical support network established by CONDE RUBIO, including the use of satellite telephones obtained from the United States to further the FARC's 1st Front terrorist-related activities.

CESAR utilized satellite telephones and SIM (Subscriber Identity Module) cards, purchased and obtained from the United States by CONDE RUBIO and other co-conspirators in the logistical support network, to conduct FARC-related activities for the 1st Front, including hostage-taking.  CESAR relied on the satellite phones obtained through the FARC logistical network to further his work on behalf of the FARC, and while he was in command of the 1st Front camp where the three Americans and others were being held hostage.

CESAR and GAFAS both utilized the satellite telephones obtained from the United States for a variety of FARC-related purposes, including in connection with the hostages.  In addition, GAFAS was at times directly in charge of the 1st Front's high-technology devices, including satellite telephones and computers, at times during the course of the charged conspiracy.  During the course of the conspiracy, CESAR relied on the satellite phones obtained through the FARC logistical network to further his work on behalf of the FARC and while he was in command of the 1st Front camp where the three Americans and others were being held

---

[4] CESAR is the common-law husband of CONDE RUBIO.

hostage.

For example, in November 2006, and again on or about April 27, 2007, CESAR called a telecommunications company in the United States and sought technical advice regarding a satellite telephone he had previously received from the United States.  The day after placing this latter call to the United States, on or about April 28, 2007, a Colombian law enforcement officer, who had been held hostage for over eight years (including by the 1st Front), escaped from captivity.  CESAR and GAFAS communicated with each other on one of the HF radios used to contact the radio call centers operated by PENA AREVALO and GUTIERREZ VERGARA to coordinate the efforts to recapture this escaped  hostage.  This hostage was being held by the 1st Front in the same compound with the three American hostages.

On or about May 9, 2007, CESAR utilized high frequency radios – the type of radio used to maintain contact with the radio call centers located in Villavicencio such as the ones operated by PENA AREVALO and GUTIERREZ VERGARA – to direct the transport of the three Americans being held then by the FARC's 1st Front.

### The American Hostages and the Rescue Operation

On July 2, 2008, 1st Front leaders CESAR and GAFAS were captured holding the three American hostages.  Based upon a ruse perpetrated by the Colombian military, CESAR and GAFAS believed they were assisting with the transport of the three American hostages in a helicopter that appeared to be operated by a non-governmental or international entity, such as the one provided by the government of Venezuela in January 2008 when the FARC released other hostages to the Venezuelan government.  The United States will present evidence at trial that the rescue operation was the direct result of a breakdown in the communications network of the 1st

Front.  Because Colombian law enforcement and military operations were based on a ruse as to who the hostages were being delivered to, it was imperative that the 1st Front leaders not be able to utilize their communications network to verify that orders were being issued by the FARC high command, rather than by Colombian government military or law enforcement officers. Because their communications network had been dismantled by the arrest of CONDE RUBIO and other members of the logistical and material supply network in February 2008, the 1st Front leaders no longer had a reliable communications network from which they could communicate outside of the 1st Front, including with their own high command.

Because CONDE RUBIO was the architect of the FARC's 1st Front's communications network, who had – either personally or through her co-conspirator intermediaries – negotiated the purchase and arranged the delivery of the satellite telephones to the FARC, it immediately became apparent that this communications network had been compromised.  Therefore, satellite telephone use could no longer be considered a safe and secure means of communication for the FARC – especially those occupying leadership and/or sensitive positions in the FARC command structure.

When FARC leaders, presumably including Eastern Bloc Commander Jorge Briceno Suarez, also known as Mono Jojoy ("MONO JOJOY") – CESAR's immediate superior in the FARC chain-of-command – learned that the FARC 1st Front's satellite communications network had been compromised with the arrests of CONDE RUBIO, PENA AREVALO, and GUTIERREZ VERGARA, MONO JOJOY ordered CESAR not to use his satellite telephone when communicating about the holding or transporting of the American hostages.  Because the FARC's most technically advanced and secure communications network had been incapacitated,

the more rudimentary HF radio communications system was infiltrated and manipulated to arrange the ruse ultimately used to rescue the American hostages.

### *Other Technology Tied to the Network and Used in Connection with the Hostages*

Other overlaps between the 1st Front's hostage taking and holding responsibilities and the communications component of the logistical supply and material support responsibilities of the network also exist.  On November 29, 2007, in the time period during which CESAR and GAFAS were charged with having held the three American hostages, FARC members were captured in Bogota, Colombia, while attempting to transport a "proof of life" video to Venezuela on behalf of the FARC.  The video had been filmed in October 2007, and the tape depicted not only other high-value political hostages then being held by the FARC, including Ingrid Betancourt, but also the three American hostages, who were being held at that very time by CESAR and GAFAS.  One of the FARC members captured was a member of the FARC 1st Front.  A second of the FARC members captured had traveled to Venezuela  immediately prior to her capture and, based on travel documentation records seized from her, was scheduled to return to Caracas, Venezuela, shortly thereafter.  Phone records also reveal she was in contact with co-conspirators located in Venezuela during this time.  Copies of this "proof of life" video, as well as photographs of the three American hostages, were seized from GAFAS's USB computer drive when he was captured on July 2, 2008.  Furthermore, the video tape seized in Bogota, Colombia, was compatible for use and recording with the videotape recorder known to be used by GAFAS to videotape hostages.[5]

---

[5] While the Government has certainly not finalized its witness and exhibit lists, we expect our presentation of the hostage taking evidence to be efficient and judicious.  A relatively small number of witnesses will adequately establish that: 1) the Americans were taken hostage and then

## ARGUMENT

### *The Proffered Evidence is Intrinsic to the Charged Conspiracy Offense*

The Government intends to introduce at trial the evidence described above as having occurred during and in furtherance of the charged conspiracy.  It demonstrates their knowledge and involvement in the conspiracy; therefore, the evidence is intrinsic to that charged offense.

Rule 404(b) provides the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The evidence the Government will introduce at trial does not fall under the definition of Rule 404(b).  In order to prove the charged material support conspiracy, the Government will present substantial evidence of the defendants' criminal wrongdoing that does not relate to incidents charged in the indictment.  This evidence – which can be characterized as "uncharged criminal conduct"– will not be offered under the authority of Rule 404(b).  Rather, it is independently admissible as direct proof of the charged offense of the conspiracy with which the defendant is charged.  It is beyond dispute that evidence of acts which are part of, or "inextricably

---

held by the 1st Front; 2) the 1st Front logistical and communications network was used to maintain custody and to transport the hostages; and 3) the disruption of that communications network by law enforcement led, at least in part, to the successful rescue operation.  This evidence will not significantly lengthen or extend the Government's presentation, or require additional expert or cooperating witness testimony.

intertwined" with, a charged crime is direct proof of that crime and is not subject to Rule 404(b)

analysis.  United States v. Badru, 97 F.3d 1471, 1474-75 (D.C. Cir. 1996), cert. denied, 520 U.S.

1213 (1997); United States v. Allen, 960 F.2d 1055, 1058 (D.C. Cir.), cert. denied, 506 U.S. 881

(1992); United States v. Diaz, 878 F.2d 608, 614-16 & n.2 & 3 (2nd Cir.), cert. denied, 493 U.S.

993 (1989); United States v. Edelin, 128 F. Supp.2d 23, 48 (D.D.C. 2001) ("Evidence of other

crimes related to the RICO enterprise and drug conspiracy charged does not come within the

definition of Rule 404(b).").

　　　　This rule applies with even greater force where, as here, the crime charged is a conspiracy

and the so-called "other crimes" are, in fact, direct evidence of the existence of the conspiracy.

See, e.g., United States v. Alexander, 331 F.3d 116, 124-27 (D.C. Cir. 2003) ("Rule 404(b)

applies only to 'extrinsic' evidence of other crimes and not to 'intrinsic' evidence of the same

crime."); United States v. Bowie, 232 F.3d 923, 926-29 (D.C. Cir. 2000) ("if the evidence is of

an act that is part of the charged offense, it is properly considered intrinsic," and Rule 404(b)

does not apply).

　　　　"In cases where the incident offered is a part of the conspiracy alleged in the indictment,

the evidence is admissible under Rule 404(b) because it is not an 'other' crime.  The evidence is

offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an

inference as to the character of the accused."  Badru, 97 F.3d at 1475; see also United States v.

Thai, 29 F.3d 785, 812-13 (2nd Cir.) (evidence of uncharged crimes admitted in RICO trial was

not 404(b) evidence; these crimes were independently admissible since they were in furtherance

of the RICO conspiracy), cert. denied, 513 U.S. 977 (1994); United States v. Escobar-De Jesus,

187 F.3d 148, 168 n.17 (1st Cir. 1999) cert. denied, 528 U.S. 1176 (2000) ("Because we

conclude that the Lajas incident was not 404(b) evidence, but rather was direct evidence of the

conspiracy charged, we have no occasion to decide whether [the witness's] testimony went

beyond matters included in the notice required by Rule 404(b)."); United States v. Green, 175

F.3d 822, 831 (10th Cir.), cert. denied, 120 S. Ct. 132 (1999); United States v. Garcia Abrego,

141 F.3d 142, 175 (5th Cir.), cert. denied, 525 U.S. 878 (1998); United States v. Miller, 116 F.3d

641 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998); United States v. Chin, 83 F.3d 83, 87-88

(4th Cir. 1996); United States v. Maceo, 947 F.2d 1191, 1198-99 (5th Cir. 1991), cert. denied,

503 U.S. 949 (1992);  United States v. Coiro, 922 F.2d 1008 (2d Cir.), cert. denied, 501 U.S. 1217

(1991);  United States v. Tejada, 886 F.2d 483, 486-87 (1st Cir. 1989); United States v. Angelilli,

660 F.2d 23, 39 (2d Cir. 1981), cert. denied, 455 U.S. 910 (1982); United States v. Salazar, 485

F.2d 1272, 1276 (2d Cir. 1973), cert. denied, 415 U.S. 985 (1974); McCormick on Evidence § 190

at 800 & n.17.

    Moreover, where evidence of the defendants' acts are either inextricably intertwined with

a charged conspiracy, or provide evidence of the conspiracy itself, it is admissible without Rule

404(b) analysis, regardless of whether those acts fall outside the period during which the

indictment alleges the conspiracy existed.  United States v. Diaz 878 F.2d at 614-616 & n.2

(crimes, wrongs or acts occurring before alleged inception date of conspiracy were relevant and

admissible in drug conspiracy prosecution and did not raise Rule 404(b) question); United States

v. Bates, 600 F.2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-

conspirators, including evidence of behavior antedating period covered by indictment, was not

extraneous evidence of other crimes, but admissible as bearing on the existence and purpose of

the conspiracy and the significance of later behavior); United States v. Bermudez, 526 F.2d 89,

95 ($^{2d}$ Cir.), cert. denied, 425 U.S. 970 (1975) (upholding admission of traces of narcotics and narcotics-related equipment seized in home six weeks after conspiracy to distribute cocaine ended).

Accordingly, the only test of admissibility for the proffered evidence is whether, pursuant to Rule 403, the "probative value of the testimony is substantially outweighed by the danger of unfair prejudice."  The probative value of the evidence is great, because, as demonstrated above, the evidence directly proves allegations contained in the Indictment.  In addition, the proffered evidence serves to establish the existence of the conspiracy, illustrates one of the fundamental purposes of the conspiracy, demonstrates that the conspiracy did indeed support a terrorist organization, one of the objects of the conspiracy, and some of the manners in which the conspiracy functioned to further its clearly articulated goals.  There is no unfair prejudice that results from admission of this evidence.  Defendant is charged with participating in, and indeed leading a key component, of a violent terrorist organization – the FARC.  One of its hallmarks is its strongly anti-American sentiment.  It has traditionally viewed American citizens as military targets, and it has engaged in violent acts against Americans in Colombia, including hostage takings, and it is so alleged in the Indictment. Indictment, Count One, #3.

 In fact, as part of the Government's burden at trial, the United States must establish that the conspiracy that the defendants were a part provided material support to a designated terrorist organization, either knowing that the organization was so designated, or knowing that it had engaged in terrorist activity or acts of terrorism.  Indictment, Count One, #12.  Certainly, the admission of evidence that the conspiracy that the defendants were a part and supported, perpetrated acts of terrorism while conducting its affairs, and using the very tools the defendants

15

provided to it, is in no way "unfairly" prejudicial.

### *Alternatively, the Evidence is Admissible Under 404(b)*

Should this Court be inclined to view this evidence under the rubric of Federal Rule of

Evidence 404(b), notwithstanding the contrary precedent in this Circuit, it is equally apparent

that the evidence should be admitted.  As the D.C. Circuit Court of Appeals has repeatedly

reiterated: "Rule 404(b) is a rule of inclusion rather than exclusion.  "[A]lthough the first

sentence of Rule 404(b) is 'framed restrictively,' the rule itself 'is quite permissive,' prohibiting

the admission of other crimes evidence 'in but one circumstance' – for the purpose of proving

that a person's actions conformed to his character."  United States v. Bowie, 232 F.3d 923,

929-30 (D.C. Cir. 2000) (*quoting* United States v. Crowder, 141 F.3d 1202, 1206 (D.C. Cir.

1998) (*en banc*).  The Court in Bowie noted that:

> [a] proper analysis under Rule 404(b) begins with the question of relevance: is the
> other crime or act relevant and, if so, relevant to something other than the
> defendant's character or propensity?  If yes, the evidence is admissible unless
> excluded under other rules of evidence such as Rule 403. Stated more formally, a
> Rule 404(b) objection will not be sustained if: 1) the evidence of other crime or
> acts is relevant in that it has 'any tendency to make the existence of any fact that is
> of consequence to the determination of the action more probable or less probable
> than it would be without the evidence,' Fed. R. Evid. 401; 2) the fact of
> consequence to which the evidence is directed relates to a matter in issue other
> than the defendant's character or propensity to commit crime; and 3) the evidence
> is sufficient to support a jury finding that the defendant committed the other crime
> or act.

Bowie, 232 F.3d at 930 (citations omitted).

As demonstrated above, the evidence that the defendants provided material support that

was used to maintain custody and control of the hostages in support of the hostage taking

allegation in Count Three of the Indictment is plainly relevant.  Moreover, the evidence is

16

relevant, not as evidence of the defendants' criminal propensity or bad character, but rather to issues that are completely proper under Rule 404(b):  motive, intent, identity, plan, and absence of mistake.  As discussed above, the fact that the organization the defendants provided material support to committed acts of terrorism and that the defendants provided this terrorist organization with some of the essential tools needed to accomplish the hostage taking, shows: (a) that there was in fact a conspiracy; (b) that the defendants participated in the conspiracy; (c) that the conspiracy did in fact support a terrorist organization committing terrorist acts; (d) and that the conspiracy assisted in maintaining control of and transporting the American held hostages, as the Indictment alleges was one of the principal goals of the conspiracy.  Indictment, Count One, #13. Each of these points goes, not to the defendants' criminal propensity or bad character, but rather to their motives in acting within the conspiracy, their intention to be a member of the conspiracy, their identities, their plan for the advancement of the conspiracy's goals, and the absence of any mistake.  Thus, even if the Court evaluates the evidence under Rule 404(b), the evidence should be admitted.

WHEREFORE, the Government respectfully requests that its motion *in limine* be granted.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
D.C. Bar Number 415-793

By:      _____/s/_____

M. JEFFREY BEATRICE
Assistant U.S. Attorney
MA Bar Number 551821
U.S. Attorney's Office
555 Fourth Street, NW, Room 11-453
Washington, D.C.  20530
(202) 353-8831
jeffrey.beatrice@usdoj.gov


_____/s/_____

ANTHONY ASUNCION
Assistant U.S. Attorney
D.C. Bar Number 420-822
U.S. Attorney's Office
555 Fourth Street, NW, Room 11-844
Washington, D.C.  20530
(202) 514-6950
anthony.asuncion@usdoj.gov


_____/s/_____

DAVID P. CORA
Trial Attorney
FL Bar Number 471-623
National Security Division
Counterterrorism Section
Washington, D.C. 20530
(202) 514-0463
Dated: November 13, 2009          david.cora@usdoj.gov